The next case for argument is 16-2105, 1-E-Way v. ITC The next case for argument is 16-2105, 1-E-Way v. ITC The next case for argument is 16-2105, 1-E-Way v. ITC Good morning, your honors. May it please the court. My name is Doug Muehlhauser representing the appellant 1-E-Way. This is an appeal from an ITC ruling on summary determination concerning indefiniteness. The ALJ erred in concluding that the claim term virtually free from interference is indefinite. Is it your position that there's a difference between free from interference and virtually free from interference? Yes. There's a difference? Those are different claim terms. They mean different things. Okay, so we're compelled to construe those terms differently, right? I believe so. Are we compelled to construe free from interference today? No, we're not. The claim term is not at issue. The asserted claims recite the claim term virtually free from interference, not simply free from interference. But the specification here never refers to the term virtually free, but it does refer to the term free. So if we were in a claim construction mode trying to construe the term in the claim virtually free, it's incumbent upon us to look at the spec to see what informs our construction of that term, right? And we would necessarily at least look at the references to free from interference to try to inform our analysis of what virtually means. I mean, this isn't one side or the other. This is just trying to see what the analytical framework for what we're doing is. Sure. I believe I understand the question. And first I would say that the specification never refers to free from interference or virtually free. What it refers to is without interference. And there's been some argument about how that should be regarded in the specification. And we feel very strongly, Winnie Wade feels very strongly, that without interference should allow for some amount of interference. And the reason is because there's a passage in the specification that specifically states that the user of the invention, I think headphone 50 is the item, can enjoy private listening through the invention without interference. The very next sentence in the specification, in this instance, says that greater user separation could be possible if we apply the fuzzy logic technique. And so if we had... Is that in column three that you're referring to, like around line 30? I just want to know which part you're referring to. That's right. I'll find the precise passage in just a second. So at Joint Appendix 102, we're looking at... That's column three, right? Column three of the 258 patent. And specifically I believe it is lines 28 through 35. There's a discussion, as I mentioned, indicating that the headphone user can enjoy private listening without interference from any other receiver headphone users, even when operated in a shared space. And the very next sentence in this paragraph, the only other sentence, says the fuzzy logic detection technique used in the receiver 50 could provide greater user separation through optimizing code division in the headphone receiver. And so if without interference we're regarded as meaning zero interference or completely free from interference, there'd be no way to have greater user separation. So let me see if I understand. When we're looking at this patent, you're saying there are at least three different kind of levels of degree here, right? There's zero interference, there's free from interference, and then there's virtually free from interference. I'm not sure those terms are used explicitly in the specification, but I think those gradations that you just mentioned are worth considering in terms of the analysis in the case. Well, I thought that's what, I mean, don't you have a chart prominently viewed in your analysis here, which is called the interference diagram? That's correct. That's from your brief. And that's what you set out at least four categories are written here. I guess, I don't know, maybe there's something in between, which is zero interference, free from interference, undetectable, virtually free from interference, and then way at the end, greater interference. So I'm not making this up on my own. I'm taking this from what you— No, the intent of that chart was to indicate that when the applicant, during prosecution of a parent application, made a distinction over the prior art and characterized his inventions as where interference is virtually eliminated, and then provided some guidance, e.g., where eavesdropping cannot occur, that distinction over the prior art simultaneously distinguished the claim term virtually free from interference. It also distinguished free from interference. And neither of those are as small as zero interference. And so that was the point. And the term, though, that we're looking at here, because we're focusing on the intrinsic record, namely the specification, specification then says without interference. So are you saying, looking at your chart here on the interference diagram, where does the reference in the specification, the only reference to interference with something going with it, is without interference, where does that fall along this continuum from zero to greater? It falls at virtually free from interference, because it allows for interference beyond free from interference, beyond zero interference. I don't understand. You say free from interference is something different than zero interference. Yes. I believe that's. We're not construing free from interference in this case. We're not construing. Well, I don't know whether I would say we're compelled to do that, but it would be helpful if we're trying to inform what virtually free from interference is, and the term in the specification is without interference. So again, tell me again what without interference is. Is your view that without interference is virtually free from interference and not free from interference? I would say we need to focus on the specification exactly as you're doing, exactly as we need to do. There's a passage that talks about CDMA, which is critical technology and wireless communications. No, but can you just go back to my talking about this interference diagram that you've created? Sure. The interference diagram is focusing on the applicant's distinction over the prior arc that was done in the prosecution of a related parent application, where the applicant provided baseline guidance associated with his description of his inventions, where interference is virtually eliminated. Okay, and that's the EG, and that's where you get the eavesdropping cannot occur, right? Correct. We believe that there's grammatical identity between where interference is virtually eliminated and virtually free from interference. I don't think that's a contested point. Grammatically, what does that mean? The terms mean the same thing. And we know that because? Where interference is virtually eliminated and virtually free from interference. Oh, okay, okay, I get that, I get that. What about the EG, though? Which is normally, and we've got cases that support this, there's a difference between IE and EG. So is it your view that that language in the prosecution history is your client was acting as a lexicographer there? No, I don't think that's providing an explicit definition. We wouldn't take that position. But what we would say is that the applicant is clearly indicating baseline guidance for determining when interference is virtually eliminated. Can I just, I understand. I'm sorry to keep, but the time is short, and I know I've cut off Judge Wallach, so I'm trying to make sure he gets this. But let me, so you keep saying that, and you say that in your brief. You use the term baseline. But am I wrong? I mean, there's a baseline, but that just gives you one end of the spectrum. It doesn't tell you about the other end of the spectrum. So I'm not sure whether or not we agree with you that there's a baseline set somewhere, whether that informs the limitations, because that gives you one end but not the other, and that's the problem we're dealing with in terms of trying to construe the claim here, right? Our position is that when somebody ordinarily Well, just say, right, I mean, you kind of shook your head halfway, sideways. Not to disagree, but I would say that when a person of ordinary skill, in wireless communications, assesses where eavesdropping cannot occur, that has significant meaning, particularly in a CDMA system, where we have coded transmissions that keep other transmissions that aren't coded separated. But that assumes that it's not a baseline, but it defines the entire scope, and you agree that an example of it doesn't mean that that is everything about it, and that defines the entire parameter of the term, right? EG means here's an example. It may give you a baseline, if that's the term you want to use, but it doesn't give you the line at the other end, right? Well, when you say an example of it, our belief is that the EG in this case is providing a condition that indicates when interference is virtually eliminated. But is it the only condition? This is an example of one of the conditions where it's virtually eliminated, but an example of one of the conditions in which it's virtually eliminated does not inform whether there are other conditions, and what those conditions are, correct? I would say this is one condition that's identified in the intrinsic evidence. It's not the only one, but it's one, and it's important, and I think it provides, we believe it provides reasonable certainty to a person of ordinary skill in the art. You raised CDMA technology. I'm looking at page 31 of your blue brief, where you have a series of bullets saying what a poseta would understand based on prior evidence, and it refers to, for example, eavesdropping and jamming of military radios, resistance to eavesdropping and interference. And so my question is, how would this support a poseta understanding interference and eavesdropping to be one and the same? Our position is not that interference and eavesdropping are one and the same. Our position is that eavesdropping, when it cannot occur, that is an indication of when interference is virtually eliminated. And the bullets that I think that you're looking at come directly from extrinsic references that we provided in the record. They're very clear, and they're consistent among them. When they identify CDMA as a technology that was developed to prevent eavesdropping, they discuss CDMA as well-known to reduce interference and prevent eavesdropping. And when I say eavesdropping, they're using the word again and again and again. We believe that the extrinsic evidence is confirming of the intrinsic evidence that a person of ordinary skill in the wireless communications art would well understand eavesdropping, what it means, how it's prevented in the context of using a CDMA system. Yeah, but eavesdropping is never in the claims here. It's not in the spec. I mean, what I'm looking for is whether an expert would have said that one skilled in the art would have understood virtually free from interference to mean this. I'm sorry to interrupt, but what about your specifications reference to private listening? Does that at all, I'm just adding on to Chief Judge Proh's question, which is would that, does that relate to the virtually free from interference term and the idea of no eavesdropping when it talks repetitively about how you want private listening on these headphones so that someone else who's in that general area who also has a set of headphones is privately listening to something else, that they still maintain their ability to privately listen to their music? Sure. I think I understand the question, and I would answer it like this. During prosecution of the related parent application in this case, there were claims that were prosecuted and that were allowed that include the term virtually free from interference and free from interference and also recite private listening. And so our view is that the term private listening is consistent with both. Virtually free from interference, you can have private listening when your system is virtually free from interference or when it's free from interference. And that sort of goes back to the interference chart that we put together. When you say that eavesdropping cannot occur where you have private listening, that is possible whether you have virtually free from interference or free from interference. There's not a distinction there in terms of being able to have private listening. So you're saying if I can get a nice, clean picture on my Sony TV, nobody can listen in on it? If you're using the CDMA technology and you have coded transmissions that are coded specifically for that TV so that it ignores everything that's not coded for it, that's correct. So what's the difference between eavesdropping and private listening? I think that the unifying concern here is, are you keeping user transmission separate in an environment where you have multiple transmissions occurring in frequencies in the same spectrum? If you're keeping them separate, eavesdropping cannot occur, and you can have private listening. In other words, eavesdropping and private listening are the same thing? I'm not going to say that they're the same thing, but when eavesdropping cannot occur and when you have private listening, can both result and they can be, they're both true at the same time, if you're keeping user transmission separate using coded transmissions. They're different, so they're both a consequence of whatever we're talking about. I thought you said a few minutes ago that they were different. Maybe I misheard. That private listening and eavesdropping not occurring are different. I would say it another way. Well, it's not not occurring that they're different. Private listening and free from eavesdropping are different situations. I mean, there may be some overlap between the two, but they're two different concepts. I think on the record, what I can tell you is that both can coexist, private listening and no eavesdropping. When you're keeping user transmissions from multiple wireless devices separate from each other, each person in the environment can have private listening apart from every other listener. Your specification says the wireless digital audio music system provides private listening without interference from other users or wireless devices. I don't see how that doesn't then equate private listening to the definition that's provided in the prosecution history that talks about having no eavesdropping. So how are they not the same? All I can tell you is that the record shows that they operate the same way. Each user can have private listening and no eavesdropping can coexist at the same time when you're using CDMA to code transmissions and keep them separate. Each user can have private listening and be free from eavesdropping. If there are differences, I'm not sure what they are on the record. I see that I'm... Yeah, I appreciate that. Thank you. We'll restore two minutes of rebuttal. I think you're on the other side. Okay, we've got two persons on this side. Ms. Valentine, you're representing the ITC? Yes, Your Honor. Good morning and may it please the court. As the court has recognized, the specification says without interference. Without. There's no wiggle room given there for what virtually might mean. And the appellant's entire argument is based upon the prosecution history of the 885 patent. Aren't they also relying on the fact that words like virtually and substantially are ubiquitous terms used in patent claims to give some wiggle room? Well, yes, Your Honor. The problem is we don't know how much wiggle room is given. Why do you need to know how much wiggle room there is if the prosecution history says exactly what virtually free from interference means? Why do you need to know what free from interference means? Well, that goes to the point I was about to make, Your Honor, is the prosecution history doesn't say what virtually free from interference means. It says what free from interference means. The statement that prosecution history appellants rely on was made with respect to claims that recited free from interference. But there were other claims that were pending at the time that had already been allowed, and those had the virtually free from interference language in them, right? Yes, Your Honor, but those claims were never rejected over the reference. Can you accept for purposes of argument that we're not buying your argument that that language is completely irrelevant and not, you know, not relevant to our analysis here? So why don't you accept that as a predicate? So then let's assume that language can be used to construe terms that have virtually free from interference. Are there other deficiencies in terms of reliance on that intrinsic evidence in the prosecution history? Well, Your Honor, I think the problem is we still don't know, and the judge made this point, that we don't know really what eavesdropping would mean in the context. As the court noted, eavesdropping is not discussed in the specification. Why doesn't it mean the same thing as not having to hear somebody else's music and being able to hear your own? The problem, so the specification at lines, at column A-102, column 3, lines 13 through 16, to say that there are other types of interference that may be at play here. There's the audio interference that may be from other. I'm sorry, are you looking at column 3 of the 258 pass? Yes, Your Honor. So column 3, the line says, so starting at line 9, receiver code generator may contain same unique wireless transmission of a signal code word that was transmitted by audio transmitter 20 and specific to a particular user. So that's typically the CDMA situation where the receiver of the headphones won't understand the code sent by the transmitter or any transmitter but only its own transmitter. But it also says other code words from wireless digital, I'm sorry, I meant to start there, other code words from wireless digital audio system 10 may appear as noise to the audio receiver. Then it says this may also be true for other device transmitted wireless signals operating in the wireless digital audio spectrum. Those device transmitted signals aren't necessarily from the audio devices at issue here. They could be from other types of systems that are transmitted in that same spectrum. In which case, what does eavesdropping mean? How do you, when you don't have audio signals, how would eavesdropping even occur? I couldn't want to look at the specification in the repeated reference to, you know, without interference, private listening without interference and understand that what we're talking about with the invention is headphones. What we're talking about with no eavesdropping is that somebody else isn't going to hear your music even though they're using headphones in the same frequency band in the same room as you. Well, Your Honor, then I would say the problem is this specification exists for all the patents in this family. The exact same specification. So this exact same specification must support their claims that recite private listening, their claims that recite free from interference, and their claims that recite virtually free from interference. The only claim that seems to be, the claims arguably that are directly supported by the specification are private listening perhaps and free from interference. The judge, as the ALJ found this case, without interference does not mean, it says nothing about virtually free from interference. Why are we talking about terms that aren't in the claims that are before us? I mean, I understood that the claims that are asserted in this case and that the ITC addressed have the virtually free from interference language. Yes. Court found them indefinite. Yes. There's a prosecution history statement here that pretty much defines what those words mean, and yet we keep on talking about other words that aren't even in the claims that are before us. Why are we talking about what those words mean if the words that are in the claims at issue were defined in the prosecution history? Why does it matter that I might not know what that word means compared to free from interference, which isn't even in the claims? Well, Your Honor, and that goes back to the point, which I guess the court may or may not accept, that the statement was not made with respect to the term virtually free from interference. And that was the basis of the judge's finding. Therefore, the definition was then stretched simply because the word virtually happened to appear in the discussion. But that claim had been withdrawn at the time the statement was made. So the judge said, okay, well, this statement says what free from interference means, and that's in the prosecution history 885, both of those claim terms were at issue. But it does not tell us what virtually free from interference means. And as you may note, the appellants did not rely on the prosecution history of the 285 patent or even the 391 patent to make this argument because there's simply nothing in those. You're saying because it's the parent, it's some other related prosecution history, we shouldn't give it as much weight? No, Your Honor. It's simply that the term that the statement was made with respect to is not the term that's at issue in this patent. And I appreciate the court's difference. Why not? I'm sorry. I understand. You're saying based on your argument that because the legend in that claims that don't say virtually free that we should understand that the only thing that was being discussed was free from interference even though the express language said virtually free. Yes, and it's not simply the legend, Your Honor. The claim 17, which was at issue in the 885 when the statement was made, was actually written in that document as being withdrawn at the time. So the appellant would have had the commission speculate as to what the claim was being made with reference to, which claims when the prosecution history seemed fairly clear that the statement was made with respect to claims that recited virtually free from interference and the claims that recited free from interference when the statement was made with respect to this trying to overcome a Lavelle reference had been withdrawn. And the commission didn't feel comfortable making that leap. The thing is is that I could appreciate your argument probably much more had it been saying Lavelle does not teach a relationship where interference is eliminated. I mean, it says is virtually eliminated and then the next sentence talks about therefore the claims are allowable. But it's almost as if they're saying Lavelle doesn't even teach this much and our claims require even more than that and so therefore the prior art doesn't satisfy our claims. I just don't see how, especially when there were these other claims that were at issue, that the court wouldn't understand what virtually eliminated means when it says right there. Well, I think another problem, Your Honor, is that there's a problem that runs throughout this prosecution history, especially the 885 where both patents were at issue.  They use the terms somewhat interchangeably. All of the rejections that the examiner states are with respect to free from interference and then they sort of tack on virtually free. So the commission looked and saw that the claims that were cited virtually free from interference had been withdrawn and said it makes sense to then apply it to the claims that were at issue. And then the judge found that the specification then supports giving a definition to free from interference. It says private listening without interference. And there's simply no way to draw an objective boundary of what virtually means beyond this statement of prosecution history, which the judge found didn't even apply to the terms that was at issue. I see my time has expired. Thank you. Mr. Flock. May it please the court. John Flock for SONY on behalf of the interveners. My client asked me when we were accused of infringement, what does this term mean? And we discussed that this court set forward criteria for terms of degree, objective boundaries, reasonable certainty. We looked in the specification and what we see in the specification is simply the term virtually free. Anything about virtually doesn't exist in this patent specification. Do you agree that virtually has a plain meaning? The word. I agree it has a plain meaning. The issue is does it have a meaning when it modifies a technical term, interference, when you are the person of ordinary skill in the art trying to build a device and knowing what's within the scope of the device, what's outside the scope of the device. Was it your position that without interference was clear? It's our position, Your Honor, that virtually without interference, there is no way to figure out the separation. We did not ultimately resolve the issue of what free from interference meant and is something that we have discussed is, you know, when something is without interference, free from interference, can there be any interference at all? And we did discuss that issue, but we didn't have to resolve that in the context of this because it is a modifier. The claim term does not say free from interference. It says virtually free. What if it said substantially free? That's a term that you as a patent attorney, I guess, are familiar with. Yes, we're familiar with both those terms. I think it would not make a difference because I'm a designer. How do I know how virtually free it has to be? The specification has to give you some guidance. The intrinsic evidence has to give you guidance. What about the prosecution history? I completely agree. The prosecution history certainly can. I'm not aware of any case from this court where simply something from the prosecution that's not connected back to some examples, some description, something in the specification that gives you the hookback is enough to give this reasonable certainty of what that would mean. Can we start with a baseline and say that something is without interference if there's no source of interference? I would agree with that, Your Honor. Okay. So then you have that baseline, and if a source of interference appears, and yet the status remains exactly the same, then it is without interference. You see what I'm saying? Yes, Your Honor. So you can define free from interference or without interference as being exactly the same as the same reception, the same standards, whatever they are, as the status when there's no source of interference. So there you go as far as all the way over to without interference virtually has to mean something else.  And so, Your Honor, that example of without interference is hypothetical when you're on some alien planet and so far away from any other transmitter. Right. There's no radiation. So, yes, in that case it clearly means none, zero, none. Right. These patterns are directed to operating in the real world. And so in the real world there are all kinds of signals. So nothing is ever without interference? Nothing is ever without signals that could be interfering. And what the inventions are, is intended to address, is a way of dealing with all these conflicting signals to separate out the one you want to get. And it's a well-known thing in CDMA, not invented by this patentee, that you can have these user codes that help you and say, hey, this is my transmitter, this is my headphone, I get to listen to my audio. The difficulty here is that we have your example, then there is free from interference or without interference in the real world where things are happening. And then I've got to go somewhere else. I've got to figure out what's virtually free from interference. What about the fact that the claim is talking about, it's not just saying free from interference, it's saying, or virtually free from interference, it's saying virtually free from interference from device-transmitted signals operating in the wireless headphone spectrum. And the claim itself is directed to headphones, and the patent talks about how you want to have private listening. Why doesn't that tell you that interference is talking about not having eavesdropping or having private listening? Because, Ron, there's some other facts here, and one of them is the patent says it operates in a certain band, and that's shown in column two, line 257 to 285, appendix 101. And what it says is here is an exemplary band in which we operate. It's known as the industrial, scientific, and medical band. In that band, the defining effect, appendix 75. I'm sorry, can you tell me? I'm sorry. It's in the column, but could you tell me the lines? 55 through 57. Thank you. And so that is a well-known band. It has a lot of stuff in it, like cordless phones. It has microwave ovens, and that information comes from a finding of fact that was uncontested, and it's at appendix 74, that it includes devices such as those things, cordless phones, Wi-Fi devices, and Wi-Fi devices might be my computer, your computer, sending e-mails, browsing for information about the weather and whether it's going to be a blizzard tomorrow. Those are not audio signals. Those are electrical signals that can cause interference. I know what you're saying, but what about the reference to private listening without interference? So you're not concerned about e-mails. You're concerned about making sure that the user of the headphone has private listening. I'm looking at line 65 of the same thing. No, I understand, Your Honor. But the interference can come from other kinds of devices that are not audio devices. It can come from when you are sending over the same frequency band. I think you're not hearing my question. My question is why wouldn't it just be the audio signals, given that this is an audio system? Because an audio system— No, I understand technically, but I'm talking about the meaning of the word when you're saying virtually free from interference. Why wouldn't one of ordinary people in the yard, with the references to private listening and the specification and the references to no eavesdropping in the prosecution history, then understand what we're talking about with the interference here is the ability to not have to hear what somebody else is hearing on their wireless headphone set. So I understand that not hearing someone else's conversation would be one of the intended benefits of this invention. But the invention is described in some technical terms in order to make the device, in that he also deals with these other kinds of devices. What we would call static. Yes, or noise, and specifically references that in the same patent, column 3, line 12 through 18. And the first part of that says, hey, there can be noise from the code words that come from my invention. The transmitter to the headset, if someone else has got one, there can be noise from those signals. And then it goes on to say, this may also be true for other device-transmitted wireless signals operating in that spectrum. It doesn't say audio devices. It says other devices. And we know from the finding of fact that there are other devices that are not audio devices. So one of ordinary skill in the art, seeing all of this intrinsic evidence, the specification, would have no reason to limit this to eavesdropping. Another point I wanted to make is one of ordinary skill in the art would know that eavesdropping simply means not having undesired artifacts from other signals. That is something actually that appellant submitted to the patent office, and it's in our brief at page 23, note 5, that in prosecution they told the patent office it's well known by those of ordinary skill in the art that interference means avoiding producing undesired artifacts. Was there any discussion anywhere that virtually might mean the same as noticeably? No, Your Honor. Okay. There's no discussion. I understand the point you're making. That is a point that is trying to be made by appellant. They're trying to actually, you know, they're reading words in and they're putting stuff, trying to put stuff in the specification that wasn't there. This, like, chart, the interference diagram, that's not in the specification. One of ordinary skill in the art, I believe, would have a very difficult time coming up with that. It's a tortured post hoc kind of reasoning. Okay. You've exceeded your time. Thank you. Thank you, Your Honor. We'll give you three minutes because the other side exceeded their time. I appreciate that. Thank you. I'd like to cover one part of the intrinsic evidence that I didn't mention previously, and that's where the patent examiner, during prosecution of a related child application in this case, demonstrated his own understanding of the claim term virtually free from interference. And I would invite the panel to look at Joint Appendix 15962. The volume here. Make it easier. 15... 15962. And there, the patent examiner is using and applying the claim term virtually free from interference. He uses it three times, puts it in quotes each time, and then even defined the term. He described the use of coded transmissions in CDMA. He described how the coding of the transmissions facilitates the separation of other transmissions from the user's separation. And then he wrote, i.e., virtually free from interference. As this court held in the recent Sonics case, and we made that case of record under Rule 28J here, a patent examiner's demonstrated understanding of a claim term provides evidence that a skilled artisan would understand the claim term. So nothing better shows that it was error here for the ALJ to deem the intrinsic evidence in this case irrelevant. Now didn't the ALJ look at this and say, in addition to it being irrelevant, say something along the lines of, but this doesn't even equate virtually free from interference to eavesdropping, right? And wasn't sure how those two related. I'm not sure that the ALJ did that. I'm not sure that he even treated this passage that we're citing to here. I'm not sure that he even did. I'm really misremembering and thinking of the red brief. But in any event, how do you respond to that argument? I mean, how does this relate to eavesdropping? It's, again, fully consistent with a situation where eavesdropping cannot occur because the examiner is recognizing that you Can I just ask you, can you use a word other than consistent with, because that's the term you used in your briefs, and that really didn't inform me. I mean, something that's a difference between something being the same as or something being consistent with is a term that has a lot of wiggle room. And I don't want to get involved in another term into this dispute. But could you use something other? Explain what you mean by consistent with. Yes. A person of ordinary skill, virtually free from difference. That's not helpful. A person of ordinary skill in this art, wireless communications, familiar with CDMA, would understand that when you're able to keep user transmissions separate from each other using coded transmissions, as the examiner recognized, i.e., virtually free from interference, that that prevents eavesdropping. And that's why CDMA is well understood and well known to prevent eavesdropping. That's the reason. Thank you. Thank you very much.